IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

GRANT PIRTLE,

     Plaintiff,

vs.                                                                                                           No. CIV-02-509 JP/JHG

ALLSUP'S CONVENIENCE STORE, INC.,
a New Mexico corporation,

     Defendant.

## MEMORANDUM OPINION AND ORDER

On February 11, 2003, Defendant Allsup's Convenience Store, Inc., ("Allsup's"), filed a

Motion for Partial Summary Judgment, requesting dismissal of Plaintiff Grant Pirtle's claims

brought under 42 U.S.C. §§ 1981, 1982, and 2000a.  (Doc. No. 27).  On February 18, 2003,

Defendant Allsup's filed a Motion for Partial Summary Judgment on State Law Claims,

requesting dismissal of Plaintiff's defamation and intentional infliction of emotional distress

claims.  (Doc. No. 35).  Having reviewed the parties' briefs and the evidence, this Court will deny

Defendant's Motion for Partial Summary Judgment as to Plaintiff's claims brought under 42

U.S.C. §§ 1981, 1982, and 2000a and grant Defendant's Motion for Partial Summary Judgment

on State Law Claims.

I.       **Background**

The following facts are those in the record which are most favorable to the Plaintiff.  See

EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1189 (2000).  On June 2, 2001, at

around 1:00 p.m., Plaintiff, an African-American man, entered an Allsup's convenience store

located on the National Parks Highway, in Carlsbad, New Mexico, and purchased a bag of ice and

three liters of soda.  Shortly before 2:00 p.m. that same day, Plaintiff went to a Chevron station in

Carlsbad and purchased gasoline and other items with a $100 bill.  Plaintiff received a number of

smaller bills as change while at the Chevron station.

Later that day, at around 3:00 p.m., Plaintiff went back to the Allsup's convenience store

and took a 12-pack of beer to the register.  Mary Jane Celaya, the clerk working at the register,

asked Plaintiff for identification, which Plaintiff provided.  Ms. Celaya then rang up the beer, the

cost of which totaled $7.63.  Plaintiff offered Ms. Celaya a $5 bill and three $1 bills as payment

from the change he had received earlier that day at the Chevron station.  Ms. Celaya took the $5

bill, held it over her head toward the light, and examined it.  Ms. Celaya then returned the $5 bill

to Plaintiff and informed Plaintiff that the bill was counterfeit and that she could not accept it.

Plaintiff then offered Ms. Celaya a $10 bill to pay for the beer.  Ms. Celaya felt the $10 bill, held it

in front of her, checked for a line on the bill, returned it to Plaintiff, and told Plaintiff that the $10

bill was counterfeit and that she could not accept it.  Plaintiff then attempted to hand the clerk a

$20 bill, but the bill floated off of the counter.  Ms. Celaya bent down, picked up the $20 bill, and

returned the bill to Plaintiff.  Ms. Celaya told Plaintiff that the $20 bill was counterfeit, that

Plaintiff's money was "no good," and that she could not help Plaintiff.  Def.'s Mem., Ex. 1 at 58.

Ms. Celaya then grabbed the 12-pack of beer and placed it behind the counter.  Plaintiff put all his

money in his wallet and left the store.  Shortly after examining Plaintiff's money, Ms. Celaya

examined the money offered by a Hispanic customer, but Ms. Celaya accepted the Hispanic

customer's money.

As soon as Plaintiff left the Allsup's store, he drove to the Drifters Convenience Store a

block away and purchased a 12-pack of beer with the same $10 bill that he had attempted to use

at the Allsup's store.  Plaintiff returned to the Chevron convenience store from which he had

gotten his change from earlier in the day and asked one of the clerks there, Denice Lewis, to

examine the $5 bill and $20 bill that Ms. Celaya had rejected.  Ms. Lewis examined Plaintiff's

money, took a pen that Chevron used to identify counterfeit bills, and marked the bills with the

pen.  Ms. Lewis told Plaintiff that the bills came up clean and were not counterfeit.

Plaintiff immediately returned to the Allsup's store and confronted Ms. Celaya about the

earlier incident and asked to speak to her manager.  Ms. Celaya stated that her manager was not

there and that she did not know her manager's name.  Ms. Celaya added that she did not care

what the Chevron clerk said because Ms. Celaya still believed Plaintiff's money to be counterfeit.

After returning home, Plaintiff informed his wife, Yolanda Pirtle, what had happened at

the Allsup's store.  Upset, Mrs. Pirtle, a light-complected Hispanic woman, wanted to return to

the Allsup's store to see if Ms. Celaya would accept the same alleged counterfeit bills from her.

Plaintiff, Mrs. Pirtle, and their son returned to the Allsup's store that same evening.  While

Plaintiff waited in the car, Mrs. Pirtle went into the Allsup's store and purchased a soda from Ms.

Celaya using the same $5 bill that Ms. Celaya had refused to accept from Plaintiff.  Ms. Celaya

took the $5 bill from Mrs. Pirtle without hesitation.  Mrs. Pirtle then commented to Ms. Celaya,

"[I]t's just kind of funny that my husband just came in here a little while ago with the same $5 bill

that I just gave you and you accused him of trying to pass a counterfeit."  Def.'s Mem., Ex. 3 at

13.  Ms. Celaya responded that she never accused Plaintiff of anything.

All of Allsup's stores are furnished with a poster published by the United States Treasury

Department with instructions on identifying counterfeit bills.  The Allsup's convenience store in

Carlsbad at which Ms. Celaya worked had one of these posters, which was located next to the

register.  Ms. Celaya had read and was familiar with this poster.  In addition to listing different features used to detect counterfeit bills, the poster lists a number of rules for what to do if a counterfeit bill is suspected, including the following:  "Keep the bill from the passer;" "Delay the passer with some excuse if possible;" "Telephone the police or the U.S. Secret Service;" and "Write your initials and the date on the border of the bill and surrender the note only to the police or Secret Service."  Pl.'s Mem., Ex. E at Ex. 2.  Ms. Celaya did not follow any of these recommendations for dealing with suspected counterfeit bills.

Allsup's has a policy against discrimination, which requires employees to treat everybody fairly and not to discriminate.

When Ms. Celaya had applied for her position at Allsup's, on her application for employment, Ms. Celaya stated that one of her reasons for leaving a prior job was because of false accusations by customers.

Plaintiff filed a timely complaint with the New Mexico Human Rights Division and received a determination of probable cause on February 7, 2002.  Although Allsup's was aware of the New Mexico Human Rights Division's probable cause finding, Allsup's never reprimanded Ms. Celaya or punished her in any way.  Nor did Allsup's instruct Ms. Celaya that there was anything she needed to change.

On May 8, 2002, Plaintiff filed suit against Allsup's alleging race discrimination in violation of 42 U.S.C. §§ 1981, 1982, and 2000a.  Plaintiff also asserted state law claims for intentional infliction of emotional distress, defamation, and prima facie tort.  Defendant filed two partial motions for summary judgment, seeking dismissal of Plaintiff's claims of race

discrimination in violation of 42 U.S.C. §§ 1981, 1982, and 2000a and of Plaintiff's intentional

infliction of emotional distress and defamation claims.

II.     **The Summary Judgment Standard**

Summary judgment is appropriate if there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  When applying

this standard, the Court examines the record evidence and reasonable inferences therefrom in the

light most favorable to the party opposing summary judgment.  Applied Genetics Int'l, Inc. v.

First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  The moving party bears the

initial burden of showing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett,

477 U.S. 317, 325 (1986).  Only then does the burden shift to the non-movant to come forward

with evidence showing that there is a genuine issue of material fact.  Bacchus Indus., Inc. v. Arvin

Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The non-moving party may not avoid summary

judgment by resting upon the mere allegations or denials of his or her pleadings.  Id.  To

withstand a motion for summary judgment, the non-movant must make specific reference to

evidence in the record.  Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1546 (10th Cir. 1995);

D.N.M. LR-Civ. 56.1(b) (placing similar burden on both parties).  Unsubstantiated allegations, no

matter how true they might be, cannot be considered.  Gross, 53 F.3d at 1546.

III.    **Discussion**

A.      **Discrimination in Violation of 42 U.S.C. §§ 1981, 1982, and 2000a**

Plaintiff asserts that Defendant Allsup's discriminated against him on the basis of his race

in violation of 42 U.S.C. §§ 1981, 1982, and 2000a.  Defendant Allsup's contends that Plaintiff's

claims under 42 U.S.C. §§ 1981, 1982, and 2000a should be dismissed because Plaintiff has failed

to demonstrate that Defendant acted with the requisite intent to discriminate on the basis of

Plaintiff's race.  Defendant Allsup's also argues that it cannot be held liable for the actions of its

clerk, Ms. Celaya, under the doctrine of respondeat superior.

        1.      **Intent to Discriminate**

Plaintiff asserts violations of 42 U.S.C. §§ 1981, 1982, and 2000a.  Section 1981 prohibits

racial discrimination in "the making, performance, modification, and termination of contracts, and

the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42

U.S.C. § 1981.  Section 1982 forbids racial discrimination in the sale of real or personal property.

42 U.S.C. § 1982.  Finally, § 2000a outlaws racial discrimination in places of public

accommodation.  42 U.S.C. § 2000a.

A plaintiff alleging racial discrimination may prove intentional discrimination through

either direct evidence of discrimination (e.g., oral or written statements on the part of a defendant

showing a discriminatory motivation) or indirect evidence of discrimination.  Hampton v. Dillard

Dept. Stores, Inc., 247 F.3d 1091, 1107 (10th Cir. 2001); Kendrick v. Penske Transportation

Services, Inc., 220 F.3d 1220, 1225 (10th Cir. 2000).  In analyzing circumstantial evidence of

race discrimination under either 42 U.S.C. §§ 1981, 1982, or 2000a, courts apply the burden-

shifting approach set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).

See Kendrick, 220 F.3d at 1225-26 (stating that McDonnell Douglas analytical framework applies

to § 1981 claims); Hornick v. Noyes, 708 F.2d 321, 325 n.8 (7th Cir. 1983) (applying McDonnell

Douglas burden-shifting analysis to § 2000a claims); Clark v. Universal Builders, Inc., 501 F.2d

324, 334 (7th Cir. 1974) (noting that McDonnell Douglas approach applies to § 1982 claims).

Under the <u>McDonnell Douglas</u> framework, the plaintiff must first establish a prima facie case of discrimination. <u>McDonnell Douglas</u>, 411 U.S. at 802-04. If the plaintiff establishes a prima facie case, then the burden shifts to the defendant to demonstrate a legitimate nondiscriminatory reason for its action. If the defendant offers a legitimate nondiscriminatory reason, the burden shifts back to the plaintiff to show that the defendant's reason is mere pretext and unworthy of belief. <u>McDonnell Douglas</u>, 411 U.S. at 802-04.

To establish a prima facie case of discrimination under federal law, the plaintiff must show: (1) that the plaintiff is a member of a protected class; (2) that the defendant had the intent to discriminate on the basis of race; and (3) that the discrimination interfered with an          activity protected by the federal statutes. <u>Hampton</u>, 247 F.3d at 1101-02; <u>Hill v. Shell Oil Co.</u>, 78 F.Supp.2d 764, 776 (N.D. Ill. 1999). Defendant Allsup's challenges the second prong of this standard, arguing that Plaintiff has not demonstrated that Defendant intended to discriminate against Plaintiff on the basis of Plaintiff's race. This Court disagrees.

Plaintiff's indirect evidence of discriminatory intent, when construed in the light most favorable to Plaintiff, is sufficient to survive summary judgment. Plaintiff has presented evidence that Ms. Celaya examined the bills of only Plaintiff, an African American, and one other Hispanic customer. Ms. Celaya refused to accept only Plaintiff's money. Ms. Celaya refused to accept three different bills from Plaintiff, telling Plaintiff his money was not good. Plaintiff has also shown evidence that Defendant's legitimate non-discriminatory reason for Ms. Celaya's refusal to accept Plaintiff's money – that Ms. Celaya believed Plaintiff's three bills were counterfeit – is mere pretext. First, there is evidence that Ms. Celaya refused to accept, not one, but three different bills from Plaintiff. Second, Plaintiff has shown evidence that Ms. Celaya did not follow

Allsup's rules for what to do if a counterfeit bill is suspected, suggesting that Ms. Celaya did not

really believe Plaintiff's bills to be counterfeit.  Third, there is evidence that Ms. Celaya accepted

the same $5 bill from Plaintiff's wife, a Hispanic woman, that Ms. Celaya had earlier refused to

accept from Plaintiff.  Fourth, Plaintiff has presented evidence that the Drifters convenience store

accepted Plaintiff's $10 bill without question.  Finally, Plaintiff has evidence that the clerk at the

Chevron station examined Plaintiff's $20 bill with a marker that she used to determine if a bill is

counterfeit and that the clerk believed the $20 bill to be clean.  Based on the totality of Plaintiff's

evidence, this Court determines that Plaintiff has shown indirect evidence, sufficient to survive

summary judgment, that Ms. Celaya had an intent to discriminate against Plaintiff on the basis of

Plaintiff's race.

2.      **Liability of Allsup's**

Defendant Allsup's additionally argues that Plaintiff's § 1981 and § 1982 claims should be

dismissed because Defendant Allsup's cannot be held liable for Ms. Celaya's alleged

discriminatory actions under the doctrine of respondeat superior.[1]  Defendant Allsup's contends

that because Ms. Celaya was not a supervisory employee, Defendant Allsup's cannot be liable for

her actions.

Numerous courts have held that a principal may be held vicariously liable for the

discriminatory acts of its agents under both § 1981 and § 1982.  See Fitzgerald v. Mountain

States Tel. and Tel. Co., 68 F.3d 1257, 1262-63 (10th Cir. 1995) (indicating that doctrine of

---

[1]Defendant also contends that Plaintiff's claim for compensatory damages under 42 U.S.C.
§ 2000a should be dismissed because § 2000a only provides for injunctive relief.  Plaintiff,
however, only seeks injunctive relief and attorneys' fees under § 2000a.  Thus, there is no need
for the Court to dismiss a claim that has not been raised.

respondeat superior applies to § 1981 actions); City of Chicago v. Matchmaker Real Estate Sales

Center, Inc., 982 F.2d 1086, 1098 (7th Cir. 1992) (holding that realty corporation and sole

shareholder were vicariously liable for compensatory damages for discriminatory acts of agents

under § 1982); Marr v. Rife, 503 F.2d 735, 740-42 (6th Cir. 1974) (holding that, under § 1982,

owner of real estate agency was vicariously liable for discriminatory acts of agents where owner

had power to control acts of salesmen); Malone v. Schenk, 638 F.Supp. 423, 425 (C.D. Ill. 1985)

(determining that employer is vicariously liable for acts of employees under § 1981); Izard v.

Arndt, 483 F.Supp. 261, 263-64 (D.C. Wis. 1980) (owner of house liable for discriminatory acts

of wife under § 1982).  Thus, to determine whether Defendant Allsup's is liable for the acts of

Ms. Celaya, this Court must look to the general common law of agency.  See E.E.O.C. v. Wal-

Mart Stores, Inc., 187 F.3d 1241, 1247 (10th Cir. 1999) (applying traditional common law of

agency principles in Title VII case); Fitzgerald, 68 F.3d at 1262-63 (applying doctrine of

respondeat superior in § 1981 action).

  According to traditional agency law, a principal is liable for the torts of its agents

committed while the agents are acting in the scope of their employment.  Restatement (Second) of

Agency § 219(1) (1958).  In this case, Plaintiff has provided evidence that Ms. Celaya was acting

in the scope of her employment when she refused to accept Plaintiff's money.  Ms. Celaya was

employed as a clerk to accept payment for store purchases, and she was working in her capacity

as a clerk at the time Plaintiff attempted to purchase the 12-pack of beer at the Allsup's

convenience store.  As a clerk, Ms. Celaya had the authority to decide who would be or who

would not be refused service.  Although Defendant Allsup's had a policy against discrimination,

Defendant Allsup's could not free itself of liability by delegating the duty not to discriminate to its

9

agent. Matchmaker, 982 F.2d at 1096. Therefore, this Court concludes that Ms. Celaya's alleged

action in refusing to accept Plaintiff's money because of his race was within the scope of her

agency and can be imputed to Defendant Allsup's. See id. at 1096 n.12 ("We note that the

discriminatory acts of the four Matchmaker agents in this case were within the scope of their

employment even though Matchmaker's policy prohibited such discrimination."); Malone, 638

F.Supp. at 425-26 (holding that refusal to sell plaintiff lottery tickets because of plaintiff's race

was within scope of employee's authority, subjecting owner to liability under § 1981); Izard, 483

F.Supp. at 263-64 (imputing owner's wife's acts of racial discrimination to owner under § 1982,

even though owner never authorized wife to engage in racial discrimination, because wife's

actions in deciding who would be accepted for tenancy were within the scope of her agency).

This Court finds the case of Malone v. Schenk particularly persuasive. In Malone, an

African-American customer sued a tavern, its employee, the state lottery division, and the

superintendent of the state lottery division for alleged discrimination arising from the tavern

employee's refusal to sell a state lottery ticket to the customer because of the customer's race.

638 F.Supp. at 424. The owner of the tavern argued that he could not be held liable under § 1981

for his employee's acts in refusing to sell the plaintiff lottery tickets based on plaintiff's race,

because such a refusal was not within the scope of the employee's authority. Id. at 425. In

examining the scope of the employee's authority, the court looked to other court decisions

involving § 1982 and noted, "Uniformly, the courts have held the principal liable for the agent's

refusal to rent or sell because of race . . . In each case the court rejected the argument raised here

that refusal to sell or lease because of race was outside the scope of the agent's authority." Id. at

425-26 (citations omitted). The court in Malone thus concluded that the owner of the tavern

10

could be held liable for his employee's acts in refusing to sell the plaintiff a lottery ticket because of her race.  Id. at 426.

Similarly, in this case, Ms. Celaya allegedly refused to sell Plaintiff a product sold by the Allsup's convenience store because of Plaintiff's race.  According to the reasoning of the court in Malone, the acts of Ms. Celaya were within the scope of her authority, and Defendant Allsup's can be held liable for Ms. Celaya's alleged discriminatory acts under both §§ 1981 and 1982.  See also Matchmaker, 982 F.2d at 1098 (finding owner of real estate agency liable for discriminatory acts of agents where owner supervises day-to-day operations of agents); Marr, 503 F.2d at 742 (holding owner of real estate agency liable for discriminatory conduct of employees because owner had power to control acts of salesmen).

Moreover, even if Ms. Celaya were acting outside the scope of her employment, agency principles nonetheless could impose liability on Defendant Allsup's.  An employer may be subject to liability for the torts of its employees acting outside the scope of their employment where the employer was negligent or reckless or the conduct violated a non-delegable duty of the employer. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 758 (1998) (citing Restatement (Second) of Agency § 219(2) (1957)).  Here, Plaintiff has provided evidence that Defendant Allsup's did not have an adequate anti-discrimination policy in place in order to train employees properly about federal anti-discrimination laws.  There is also evidence that Defendant Allsup's hired Ms. Celaya, despite its knowledge that Ms. Celaya left previous employment because of accusations by customers.  Defendant Allsup's may thus be held liable for the acts of Ms. Celaya based on Defendant Allsup's negligence in hiring and training Ms. Celaya.  See Magnum Foods, Inc. v. Continental Cas. Co., 36 F.3d 1491, 1500 (10th Cir. 1994) (noting that employer may be directly

11

liable for negligent supervision or hiring of unfit employee).  Additionally, Defendant Allsup's

may be liable because the duty to obey anti-discrimination laws is non-delegable.  United States v.

Youritan Constr. Co., 370 F.Supp. 643, 649 (N.D.Cal. 1973) ("The discriminatory conduct of an

apartment manager or rental agent is, as a general rule, attributable to the owner and property

manager of the apartment complex, both under the doctrine of respondeat superior and because

the duty to obey the law is non-delegable.").

For all the above reasons, a jury may find Defendant Allsup's liable for the alleged

discriminatory acts of Ms. Celaya.  Therefore, Defendant's motion for summary judgment on

Plaintiff's federal claims will be denied.

B.      **Intentional Infliction of Emotional Distress**

In Count 4 of Plaintiff's complaint, Plaintiff asserts a cause of action for intentional

infliction of emotional distress.  In order to establish a claim of intentional infliction of emotional

distress, a plaintiff must prove the following elements:  (1) the conduct in question was extreme

and outrageous; (2) the conduct of the defendant was intentional or in reckless disregard of the

plaintiff; (3) the plaintiff's mental distress was extreme and severe; and (4) there is a causal

connection between the defendant's conduct and the plaintiff's mental distress.  Trujillo v.

Northern Rio Arriba Electric Coop., Inc., 131 N.M. 607, 616, 41 P.3d 333, 342 (2001).

Defendant contends that Plaintiff's intentional infliction of emotional distress claim should be

dismissed because Plaintiff cannot demonstrate that Defendant's conduct was extreme and

outrageous or that Plaintiff suffered severe emotional distress as a result of the alleged

discriminatory conduct.

For conduct to be extreme and outrageous, the conduct must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  Id. (quoting Restatement (Second) of Torts § 46 cmt. d).  The mere fact that conduct is insulting or will deeply hurt another's feelings is insufficient to give rise to liability.  Padwa v. Hadley, 127 N.M. 416, 420, 981 P.2d 1234, 1238 (Ct. App. 1999).  This Court determines that Ms. Celaya's alleged refusal to sell Plaintiff a 12-pack of beer because of his race, while highly offensive, does not rise to the level of being "beyond all possible bounds of decency" and "utterly intolerable in a civilized community."  See Martin v. Citibank, N.A., 762 F.2d 212, 220 (2d Cir. 1985) (holding that, despite unacceptability of racial discrimination in society, defendant's alleged conduct in requiring plaintiff to take a polygraph test because of her race did not rise to requisite level of outrageousness); Trujillo, 131 N.M. at 343, 41 P.3d at 617 (holding that termination of employee who had been cleared to return to work on part-time basis was not extreme and outrageous conduct); Jaynes v. Strong-Thorne Mortuary, Inc., 124 N.M. 613, 618, 954 P.2d 45, 50 (1997) (determining that conduct of mortuary, which had disturbed grave of mother during burial of mother's son in family plot was not extreme and outrageous to support intentional infliction of emotional distress claim).  Although this Court recognizes that in certain instances repeated acts or a pattern of racial discrimination might constitute extreme and outrageous conduct, see Green v. American Broadcasting Companies, Inc., 647 F.Supp. 1359, 1362-63 (D.D.C. 1986) (noting that pattern of harassment may, if serious enough, constitute extreme and outrageous conduct), the alleged single instance of racial discrimination here does not meet that high standard.

Moreover, Plaintiff's intentional infliction of emotional distress claim must be dismissed because Plaintiff has not met the severe emotional distress requirement. To recover under an intentional infliction of emotional distress claim, a plaintiff's severe emotional distress must be such that "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances." Trujillo, 131 N.M. at 343, 41 P.3d at 617 (internal quotations omitted). In this case, Plaintiff has evidence that, as a result of the alleged discrimination, he suffered a loss of sleep, for which he was prescribed medication; a fear of making cash transactions; and feelings of lost dignity and helplessness. This evidence is not sufficient to prove that Plaintiff's distress was so severe that no reasonable person could endure it. See Daemi v. Church's Fried Chicken, Inc., 931 F.2d 1379, 1389 (10th Cir. 1991) (determining that plaintiff did not show requisite severe emotional distress even where discriminatory conduct made plaintiff sick to his stomach, insecure, nervous, and unrestful); Trujillo, 131 N.M. at 343, 41 P.3d at 617 (holding that plaintiff failed to demonstrate severe emotional distress even though plaintiff was offended, felt lousy and depressed, had erratic eating habits, and was prescribed Prozac); Silverman v. Progressive Broadcasting, Inc., 125 N.M. 500, 510, 964 P.2d 61, 71 (Ct. App. 1998) (stating that improper treatment was not sufficient to show severe emotional distress).

In sum, the alleged discriminatory conduct, although despicable, was not sufficiently extreme and outrageous to support a claim for intentional infliction of emotional distress. Plaintiff also failed to demonstrate that, as a result of the alleged incident, he suffered the severe emotional distress required by law. Consequently, Plaintiff's intentional infliction of emotional distress claim should be dismissed.

C.      **Defamation**

Count 5 of Plaintiff's complaint asserts a claim for defamation.  However, in response to Defendant's partial motion for summary judgment on Plaintiff's state law claims, Plaintiff withdrew his defamation claim.  Hence, Plaintiff's defamation claim will be dismissed with prejudice.


IT IS THEREFORE ORDERED that

1.      Defendant's Motion for Partial Summary Judgment (Doc. No. 27), requesting dismissal of Plaintiff's claims brought under 42 U.S.C. §§ 1981, 1982, and 2000a, is DENIED.

2.      Defendant's Motion for Partial Summary Judgment on State Law Claims (Doc. No. 35), requesting dismissal of Plaintiff's intentional infliction of emotional distress and defamation claims, is GRANTED.

3.      Plaintiff's intentional infliction of emotional distress and defamation claims will be dismissed with prejudice.


_____

CHIEF UNITED STATES DISTRICT JUDGE